O

1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                           CENTRAL DISTRICT OF CALIFORNIA

10

11  APARTMENT ASSOCIATION OF LOS  )  Case No. CV 22-02085 DDP (JEMx)
    ANGELES COUNTY, INC.,         )
12                                )
                     Plaintiff,   )  **ORDER GRANTING PLAINTIFF'S MOTION**
13                                )  **FOR PRELIMINARY INJUNCTION**
          v.                      )
14                                )
    COUNTY OF LOS ANGELES,        )  [Dkt. 17]
15                                )
                     Defendants.  )
16  _____)

17

18        Presently before the court is a Motion for Preliminary

19  Injunction filed by Plaintiffs Apartment Association of Los Angeles

20  County, Inc. ("AAGLA") and Apartment Owners Association of

21  California, Inc. ("AOA").  Having considered the submissions of the

22  parties and heard oral argument, the court grants the motion and

23  adopts the following Order.

24  **I.   Background**

25        The global COVID-19 pandemic is now in its third year.  At the

26  outset of the pandemic in the spring of 2020, Defendant Los Angeles

27  County ("the County") implemented a moratorium on evictions of

28  residential tenants.  (Complaint ¶ 2.)  The moratorium was premised

    on the County Board of Supervisors' finding that "COVID 19 is

1  causing, and is expected to continue to cause, serious financial

2  impacts to Los Angeles County residents and businesses, . . .

3  impeding their ability to pay rent[.]"  (Plaintiff's Request for

4  Judicial Notice, Ex. 7 at 203.)  The Board further found that

5  "displacing residential . . . tenants . . . will worsen the present

6  crisis," and "severely impact the health, safety and welfare of

7  County residents."  (Id. at 203-204.)

8        Although it remains to be seen whether, as Plaintiffs

9  optimistically assert, "[w]e are at the end stages of the

10 pandemic," 2022 has not seen the lockdowns and other economic

11 disruptions of the earlier days of the public health crisis.

12 (Reply at 16.)  Fortunately, Los Angeles County's COVID 19

13 community level, as determined by the Centers for Disease Control,

14 is currently "low."[1]  Businesses are open, and the County no longer

15 requires that masks be worn in most indoor settings.[2]

16 Nevertheless, the Board found earlier this year that the emergence

17 of COVID-19 variants, such as the Omicron variant, "demonstrat[es]

18 a continuing necessity to preserve and extend many [] tenant

19 protections."  (RJN, Ex. 7 at 202 at 207.)  Accordingly, the County

20 replaced its residential eviction moratorium with a revised set of

21 lesser "Tenant Protections."  (RJN, Ex. 7 at 202).[3]

22

23 _____

24      [1]
   http://publichealth.lacounty.gov/media/Coronavirus/data/response-pl

25 an.htm

26      [2]
   http://publichealth.lacounty.gov/media/Coronavirus/docs/HOO/COVID19

27 ResponsePlan.pdf at 4-5.

28      [3] Pursuant to state law, the protections at issue here took
   effect July 1, 2022.  Cal. Civ. Proc. Code § 1179.05(a)(1).

1     Plaintiffs are comprised of and represent over 30,000 owners

2 and managers of rental housing units.  (Complaint ¶¶ 11-12.)

3 Plaintiffs' Complaint seeks declaratory and injunctive relief under

4 42 U.S.C. § 1983 and California Code of Civil Procedure § 1060 to

5 enjoin enforcement of the Tenant Protections, alleging that the

6 Tenant Protections violate Plaintiffs' due process rights and are

7 unconstitutionally vague.  Plaintiffs' instant motion seeks a

8 preliminary injunction on those same grounds.

9 **II.  Legal Standard**

10     A party seeking a preliminary injunction must show that (1) it

11 is likely to succeed on the merits; (2) it will suffer irreparable

12 harm in the absence of preliminary relief; (3) the balancing of the

13 equities between the parties that would result from the issuance or

14 denial of the injunction tips in its favor; and (4) an injunction

15 is in the public interest.  <u>Winter v. Natural Resources Def.</u>

16 <u>Council</u>, 555 U.S. 7, 20 (2008).  Preliminary relief may be

17 warranted where a party (1) shows a combination of probable success

18 on the merits and the possibility of irreparable harm, or (2)

19 raises serious questions on such matters and shows that the balance

20 of hardships tips in favor of an injunction.  <u>See Arcamuzi v.</u>

21 <u>Continental Air Lines, Inc.</u>, 819 F.2d 935, 937 (9th Cir. 1987).

22 "These two formulations represent two points on a sliding scale in

23 which the required degree of irreparable harm increases as the

24 probability of success decreases."  <u>Id.</u>; <u>see also</u>

25 <u>hiQ Labs, Inc. v. LinkedIn Corp.</u>, 938 F.3d 985, 992 (9th Cir.

26 2019).  Under both formulations, the party must demonstrate a "fair

27 chance of success on the merits" and a "significant threat of

28

1  irreparable injury" absent the requested injunctive relief.[4]

2  Arcamuzi, 819 F.2d at 937.

3  **III. Discussion**

4      A.  Likelihood of Success on the Merits

5      Plaintiffs contend, among other things, that the Tenant

6  Protections at issue here are unconstitutionally vague.  Indeed,

7  determining the nature and scope of the extant Tenant Protections

8  in the first instance is no simple task.

9      Rather than adopt a new resolution implementing the Tenant

10 Protections, the Board of Supervisors issued a resolution ("the

11 Resolution") incorporating over a dozen prior resolutions and

12 amendments related to COVID-19.[5]  (RJN Ex. 7 at 207.)  The result

13 is a resolution that lists, across several different sections and

14 subsections, different types of protections, applicable at

15 different times, to different groups of tenants.  As relevant here,

16 Section IV(K) of the Resolution defines the term "Protections" only

17 to mean "the set of tenant protections applicable to a Tenant

18 pursuant to the terms of this Resolution," providing little

19 guidance to landlords or tenants.  (RJN Ex. 7 at 209).

20     Section VI of the Resolution is, somewhat misleadingly, titled

21 "Eviction Protections."  (RJN Ex. 7 at 211).  As the County appears

22 to acknowledge, however, Section VI does not actually describe the

23

24     [4]  Even under the "serious interests" sliding scale test, a
25 plaintiff must satisfy the four Winter factors and demonstrate
   "that there is a likelihood of irreparable injury and that the
26 injunction is in the public interest."  Alliance for the Wild
   Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).
27     [5]  Resolution of the Board of Supervisors of the County of Los
   Angeles Further Amending And Restating The County of Los Angeles
28 COVID-19 Tenant Protections Resolution (January 25, 2022).  (RJN
   Ex. 7 at 202).

4

form of any specific, currently applicable eviction or tenant protections regarding COVID-related nonpayment of rent.  Section VI(A)(1) states, "During the time periods set forth below, a Tenant <u>shall not be evicted</u> for nonpayment of rent . . . if the Tenant demonstrates an inability to pay rent . . . due to Financial Impacts Related to COVID-19 . . . ."  (RJN Ex. 7 at 211 (emphasis added)).  Despite this seemingly categorical language, the County asserts that there is no longer a total moratorium on evictions for COVID-related nonpayment of rent, and that different, narrower protections apply during the current "Extensions Protections Period" pursuant to Section VI(A)(1)(b)(ii).  (<u>Id.</u> at 212.)  That subsection provides that a more limited pool of qualifying residential tenants "<u>is protected from eviction</u> under this Resolution."  (<u>Id.</u> (emphasis added)).  Only a residential tenant who (1) has household income equal to or less than 80 percent of the Area Median Income, (2) is unable to pay rent (3) "so long as the reason for nonpayment was Financial Impacts Related to COVID-19," (4) notifies their landlord of this COVID-related inability to pay and (5) self-certifies income level and financial hardship (6) within seven days after the date missed rent is due "is protected from eviction." (<u>Id.</u>) Landlords "must accept" a qualifying tenant's self-certification of income level and financial hardship.  (<u>Id.</u> at 216.)  Section VI(A)(1)(b)(ii) does not, however, set forth what "protection from eviction" entails.

According to the County, that a qualifying tenant "is protected from eviction" does not actually mean that the tenant cannot be evicted.  Such is not apparent from Section VI(A)(1)(b)(ii), or from any other provision in Section VI (or

Section IV).  Rather, to determine what "protection from eviction" under Section VI(A)(1)(b)(ii) means, a tenant or landlord must refer to the language of Section XI, the "Remedies" section of the Resolution.  (RJN Ex. 7 at 221.)  There, Section XI(C) states that "any Protections . . . provided under this Resolution shall constitute an affirmative defense for a Tenant in any unlawful detainer action . . . ."  (Id. (emphasis added).)  Thus, under the County's interpretation, the current Tenant Protections do no more than provide an affirmative defense to a discrete set of tenants, under relatively specific circumstances, who are already involved in unlawful detainer proceedings.

That the Tenant Protections are difficult to suss out is not sufficient to render them unconstitutionally vague.  See United States v. Williams, 553 U.S. 285, 304 (2008) ("perfect clarity and guidance has never been required").  The question, rather, is whether the resolution gives "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  Laws must also provide sufficiently explicit standards to prevent arbitrary or discriminatory enforcement.  Id.; Williams, 553 U.S. at 304.

The County contends that the Tenant Protections cannot possibly run afoul of these prescriptions because they do no more than establish a new affirmative defense for tenants, and thus do not prohibit landlords from doing anything.  That blinkered reading of the Resolution, however, ignores Section IX(I), which expressly prohibits landlords from "[t]aking action to terminate any tenancy including service of any notice to quit or notice to bring any

1  <u>action to recover possession of a rental unit</u> based upon facts

2  which the Landlord has no reasonable cause to believe to be true or

3  upon a legal theory which is untenable . . . ."  (RJN Ex. 7 at 220

4  (emphasis added).)   Violations of Section IX subject landlords to

5  administrative fines and civil and criminal penalties under

6  Sections X and XI.  (<u>Id.</u> at 220-221.)   In other words, a landlord

7  cannot bring an unlawful detainer action, at peril of civil and

8  criminal penalties, unless the landlord reasonably believes that a

9  tenant's affirmative defense, created by and comprising the Tenant

10  Protections, will fail.

11      A landlord cannot, of course, form any reasonable belief about

12  the viability of a particular tenant's affirmative defense without

13  an understanding of the elements of the defense.   Although

14  seemingly limited in application, the affirmative defense created

15  by the Tenant Protections is expansive in scope, in that it applies

16  to nonpayment of rent "so long as the reason for nonpayment was

17  Financial Impacts Related to COVID-19."  (RJN Ex. 7 at 212.)

18  "Financial Impacts" include (1) "substantial loss of income caused

19  by the COVID-19 pandemic," (2) "loss of revenue or business . . .

20  due to business closure," (3) "increased costs," (4) "reduced

21  revenues or other similar reasons impacting a Tenant's ability to

22  pay rent due," (5) layoffs or "loss of compensable hours of work or

23  wages," and (6) "extraordinary out-of-pocket medical expenses."

24  (<u>Id.</u> at 208).  "Related to COVID-19" means not just "related to . .

25  . [a] suspected or confirmed case of COVID-19, or caring for a

26  household or family member who has a suspected of confirmed case of

27  COVID-19," but also related to "reduction or loss of income or

28

1    revenue resulting from . . . economic or employer impacts related

2    to COVID-19."  (Id. at 209).

3         Given the breadth of these definitions, it would be impossible

4    for a landlord to determine whether the affirmative defense might

5    apply in any particular instance.  The bounds of, for example,

6    "increased costs" resulting from "economic . . . impacts related to

7    COVID-19" are virtually limitless.  Even the most exacting

8    categories of "Financial Impacts," namely "substantial loss of

9    income" and "extraordinary" medical expenses, are inherently

10   variable and subjective.  Indeed, the County acknowledges that "a

11   particular amount in lost income may be 'substantial' for one

12   tenant but not for another, just as a certain amount of medical

13   expenses may be 'extraordinary' to one tenant but not another."

14   (Opp. at 14:19-21.)  In the County's view, this variability is a

15   feature, not a bug, insofar as it "permits the Resolution to apply

16   to different tenants of varying circumstances."[6]  (Id. at 14:18-

17   19.)  That may be, but that same vagueness also deprives landlords

18   of the ability to gauge whether any particular tenant can

19   successfully invoke the affirmative defense.  Without any

20   meaningful guidance from the Resolution, landlords are left to

21   guess, not just as to the likelihood of success of any unlawful

22   detainer action, but as to whether the very filing of any such

23   action is prohibited.

24

25

26        [6] The court notes that other provisions in the Resolution, and
     even within Section VI(A)(1)(b)(ii), are not so flexible.  For
27   example, the affirmative defense applies only "so long as the
     reason for nonpayment was Financial Impacts Related to COVID-19."
28   (RJN Ex. 7 at 211-212 (emphasis added).)

8

1       Even if a landlord chooses to run the risk of initiating an
2   unlawful detainer proceeding, it is unclear whether she may contest
3   all of the elements of the Tenant Protections affirmative defense.
4   Among the required elements of the defense are that a tenant (1) be
5   unable to pay rent and (2) have a household income equal to or less
6   than eighty percent of the Area Median Income.  The County concedes
7   that a tenant bears the burden of proof of establishing the
8   affirmative defense.  The Resolution, however, states that
9   "Landlords must accept" "a Residential Tenant whose household
10  incomes [sic] is at 80 percent Area Median Income or below self-
11  certifies [sic] their income level and financial hardship . . . ."
12  (RJN Ex. 7 at 216).  At oral argument, the County maintained that
13  the phrase "must accept" does not mean that landlords must accept
14  the <u>merits</u> of a tenant's self-certification, but rather that "the
15  landlord must accept <u>delivery</u> of that self-certification."  That
16  interpretation has no support in the text of the Resolution, which
17  does not give a person of ordinary intelligence reasonable notice
18  that she is free to dispute a tenant's income level or degree of
19  financial hardship, in court or elsewhere.
20      The County also appears to suggest that any infirmities in the
21  Resolution are of no moment because the affirmative defense must be
22  proven in "a full-fledged adversarial proceeding with a trial with
23  multiple levels of discovery available to both sides," and a
24  neutral decisionmaker need not accept a tenant's self-certification
25  as sufficient to carry the burden of proof.  This argument is not
26  persuasive.  As an initial matter, if a landlord "must accept" a
27  tenant's representations as to certain elements of the affirmative
28  defense, it is unclear how any contrary position could ever be

1  presented to a court in an adversarial proceeding.  Furthermore,

2  and more fundamentally, a vague, standardless statute cannot be

3  resuscitated simply by delegating definitional responsibility to a

4  court.  "If arbitrary and discriminatory enforcement is to be

5  prevented, laws must provide explicit standards for those who apply

6  them."  <u>Grayned</u>, 408 U.S. at 108.  The void for vagueness doctrine

7  "guards against arbitrary or discriminatory law enforcement by

8  insisting that a statute provide standards to govern the actions of

9  police officers, prosecutors, <u>juries, and judges</u>."  <u>Sessions v.</u>

10  <u>Dimaya</u>, 138 S. Ct. 1204, 1212 (2018) (emphasis added).  The

11  Resolution provides no more guidance to a neutral factfinder than

12  to a landlord as to what financial impacts a tenant must suffer to

13  invoke the affirmative defense.

14      Accordingly, Plaintiffs are likely to succeed on the merits of

15  their claim that the Resolution's Tenant Protections are

16  unconstitutionally vague.[7]

17      B.   Remaining Factors

18      The other <u>Winter</u> factors also weigh in favor of a preliminary

19  injunction.  "It is well established that the deprivation of

20  constitutional rights unquestionably constitutes irreparable

21  injury."  <u>Melendres v. Arpaio</u>, 695 F.3d 990, 1002 (9th Cir. 2012)

22  (internal quotation marks omitted); <u>see also</u> <u>Goldie's Bookstore,</u>

23  <u>Inc. v. Superior Ct. of State of Cal.</u>, 739 F.2d 466, 472 (9th Cir.

24  1984) ("An alleged constitutional infringement will often alone

25  constitute irreparable harm.").  When the government is a party,

26  the remaining factors, the balance of equities and the public

27

28      [7] Having so concluded, the court does not reach Plaintiffs'
other claims.

10

1   interest, merge.  California v. Azar, 911 F.3d 558, 575 (9th Cir.

2   2018).  Here, the question is a close one.  The public interest is,

3   no doubt, served by efforts to minimize the spread of COVID-19.

4   See, e.g., Westlake Fitness LLC v. Cnty. of Ventura, No.

5   21-CV-0770-CBM-(EX), 2021 WL 971148, at *2 (C.D. Cal. Jan. 29,

6   2021).  In light of the County's current approach to other

7   containment measures, however, the denial of an injunction would

8   seemingly do little to further that objective.  Furthermore, "it is

9   always in the public interest to prevent the violation of a party's

10  constitutional rights."  Melendres, 695 F.3d at 1002 (internal

11  quotation marks and citation omitted).  "[P]ublic interest concerns

12  are implicated when a constitutional right has been violated[]

13  because all citizens have a stake in upholding the Constitution."

14  Hernandez v. Sessions, 872 F.3d 976, 996 (9th Cir. 2017) (quoting

15  Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005)).

16  Moreover, the Resolution's vagueness problems appear largely to be

17  a matter of drafting, rather than fundamental character.  "When

18  constitutional alternatives are available to achieve the same

19  goal," maintaining an unconstitutional policy is not in the public

20  interest.  Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 637 (2d

21  Cir. 2020).  A preliminary injunction is, therefore, warranted

22  here.

23  **IV.  Conclusion**

24       For the reasons stated above, Plaintiffs' Motion for

25  Preliminary Injunction is GRANTED.  Effective December 1, 2022, the

26  County is hereby enjoined from enforcing the Tenant Protections

27  described in Section VI(A)(1)(b)(ii) of the Resolution, as well as

28

11

those portions of Sections IX(I), X, and XI that reference or
incorporate Section VI(A)(1)(b)(ii).[8]



IT IS SO ORDERED.



Dated: October 19, 2022

                              DEAN D. PREGERSON
                              United States District Judge

---

[8] Given the ostensible purpose of the Tenant Protections, the
potential for the County to adopt a constitutionally viable
alternative, and the need for tenants and landlords to adjust to
and plan for a post-injunction legal landscape, the court finds
that a brief transitional period is warranted.